IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:10cr413 |
| | ) | |
| FAROOQUE AHMED, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Counts 1 and 2 of the Indictment and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. From on or about April 18, 2010, and continuing through at least on or about October 27, 2010, within Arlington County in the Eastern District of Virginia and elsewhere, defendant FAROOQUE AHMED did knowingly and unlawfully attempt to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b), to wit, personnel and services, to a foreign terrorist organization, namely al-Qaeda, in that, defendant AHMED attempted to assist others whom he believed to be members of al-Qaeda in planning multiple bombings to cause mass casualties at Metrorail stations in the Washington, D.C. metropolitan area.

2. From on or about May 15, 2010, and continuing through at least on or about October 25, 2010, within Arlington County in the Eastern District of Virginia and elsewhere, defendant FAROOQUE AHMED did knowingly and unlawfully surveil, photograph, videotape, diagram,

and otherwise collect information with the intent to plan or assist in planning the following unlawful activities:

    A.    wrecking, derailing, setting fire to, and disabling railroad on-track equipment and mass transportation vehicles;

    B.    placing a destructive substance or a destructive device in, upon, or near railroad on-track equipment or a mass transportation vehicle with intent to endanger the safety of persons or with a reckless disregard for the safety of human life;

    C.    setting fire to, undermining, making unworkable, unusable, and hazardous to work on and use, and placing a destructive substance and destructive device in, upon, and near any - -

> tunnel, bridge, viaduct, trestle, track, electromagnetic guideway, station, depot, terminal, or any other way, structure, property, or appurtenance used in the operation of and in the support of the operation of a railroad carrier and with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck railroad on-track equipment; or

> garage, terminal structure, track, electromagnetic guideway, supply, or facility used in the operation of, or in support of the operation of, a mass transportation vehicle, and with intent to, or knowing or having reason to know, such activity would likely derail, disable, or wreck a mass transportation vehicle used, operated, or employed by a mass transportation provider;

as described in Sections 1992(a)(1), (a)(2), and (a)(4) of Title 18 of the United States Code, in that defendant AHMED surveilled, photographed, videotaped, diagramed, and otherwise collected information with the intent to plan and assist in planning multiple bombings to cause mass casualties at Metrorail stations in the Washington, D.C. metropolitan area.

3. In January 2010, AHMED and an associate were inquiring about making contact with a terrorist organization in order to participate in jihad by traveling overseas to fight coalition forces in Afghanistan. In April 2010, AHMED and his associate received an email that notified

AHMED that he could meet an individual that AHMED believed to be a representative of a terrorist organization at a hotel near the Washington-Dulles International Airport on April 18, 2010.

4. On April 18, 2010, AHMED drove to a hotel near the Washington-Dulles International Airport in Dulles, Virginia, and met in the lobby of that hotel with a courier he believed to be affiliated with a terrorist organization. AHMED received from that individual a Koran that contained a document which provided potential locations at which future meetings could be arranged, and provided code words for locations to be used for future meetings. AHMED and his associate used those code words in emails to indicate that AHMED planned to meet an individual that AHMED believed to be a representative of a terrorist organization on May 15, 2010, at a hotel in Northern Virginia.

5. On May 15, 2010, AHMED met with an individual he believed to be a terrorist operative in a hotel room in Sterling, Virginia. At this meeting, the individual who AHMED believed to be a terrorist operative (hereinafter "Operative-1") asked AHMED why AHMED had come to see him. AHMED replied that he wanted to fight and kill Americans in Afghanistan. When Operative-1 asked AHMED to clarify whether he wanted to become a martyr, AHMED responded "of course" and stated that he wanted to fight. AHMED said that he might be ready to travel overseas to conduct jihad in January 2011 after he had completed the Hajj pilgrimage to Saudi Arabia in November 2010.

6. At the meeting, Operative-1 told AHMED that his organization would require certain tasks to be completed during the next six months in preparation for an operation. These tasks would include gathering information on specific locations in the Washington, D.C. area,

including the Arlington Cemetery Metrorail station and a hotel in Washington, D.C. AHMED agreed to watch and photograph the Arlington Cemetery Metrorail station and a hotel in Washington, D.C. in order to obtain information about their security and busiest periods, and report back to Operative-1.

7. In July 2010, in Arlington, Virginia, AHMED participated in the surveillance and the recording of video images of the Arlington Cemetery Metrorail station.

8. On July 13, 2010, AHMED sent an email to signal that he had completed the surveillance and the recording of video images of a Metrorail station.

9. On July 19, 2010, AHMED again met with Operative-1 in a hotel room in Sterling, Virginia. AHMED told Operative-1 that AHMED had gone to the Arlington Cemetery Metrorail station and completed one of the two tasks that Operative-1 had provided him. AHMED told Operative-1 that, if you come from outside the cemetery there are guards standing there, and when you come from inside the station there is a security camera and then a security guard.

10. At the meeting, AHMED also provided Operative-1 with a thumb drive which contained recorded video of the Arlington Cemetery Metrorail station. AHMED explained that he and an associate used a mobile phone video camera, with the associate holding the phone up as though talking on the phone and not recording. Operative-1 then explained to AHMED that his information-gathering was in preparation for an attack on a total of four locations, including the Arlington Cemetery, Courthouse, and Pentagon City Metrorail stations, and a hotel in Washington, D.C. AHMED replied that those were good targets that contained many people. AHMED agreed to continue gathering information on the targets as he did for the Arlington Cemetery Metrorail station. AHMED further said that he wanted to donate $10,000 to support

their brothers overseas, and that he would collect donations from people even if he had to do it in the name of another cause, and send it to the organization in increments of $1,000 in order to not raise any red flags.

11. On August 22, 2010, AHMED participated in the surveillance of the Courthouse and Pentagon City Metrorail stations in Arlington, Virginia.

12. On September 28, 2010, Ahmed and Operative-1 again met in a hotel room in Northern Virginia. Upon AHMED's arrival, Operative-1 introduced AHMED to another individual who represented himself as the boss of Operative-1. This newly introduced individual (hereinafter "Operative-2"), asked AHMED if AHMED knew the identity of the organization to which Operative-1 and Operative-2 belonged; AHMED said - - and then repeated - - that he understood them to belong to Al-Qaeda.

13. At the meeting on September 28, 2010, AHMED provided Operative-1 and Operative-2 with a thumb drive containing videotaped images of the Courthouse and Pentagon City Metrorail stations, and told them that he had completed all the tasks except for one (a hotel in Washington, D.C.).

14. Operative-2 told AHMED that the organization was planning to attack these sites some time in 2011. AHMED described the entrances and general layouts of the stations, and stated that between 4:00 p.m. and 5:00 p.m. would be the best time to stage an attack to cause the highest number of casualties. AHMED also sketched and provided to Operative-1 and Operative-2 a written diagram of each Metrorail station on three small pieces of paper, and provided suggestions on where to place explosives at each location to kill the most people.

15. AHMED was shown three backpacks and asked which would be the most conducive for the attacks. AHMED tried one of them on and explained that, although the backpacks would

work, it would be better to use wheeled suitcases. AHMED stated that he wanted to kill as many military personnel as possible, and suggested an additional attack on the Crystal City Metrorail Station. AHMED agreed to provide the bombers with Metrocards and to conduct surveillance on the Crystal City Metrorail station.

16. AHMED told Operative-1 and Operative-2 that AHMED wished to fight in jihad himself, and that he has trained to do so using various firearms. AHMED previously discussed the various firearms he has used and/or purchased (including rifles and a shotgun) and stated that he had been to a shooting range. AHMED also noted that he had studied martial arts for four years, learned knife and gun techniques, and learned disarming techniques. AHMED said that he could teach these skills to others and indicated that he could purchase additional firearms.

17. On October 18, 2010, AHMED received an email message from an individual whom he believed to be affiliated with al-Qaeda, indicating that a courier would be available to meet him between October 27 and October 29, 2010, to pick up the results of the surveillance of the Crystal City Metrorail station.

18. On October 21, 2010, AHMED participated in the surveillance of the Crystal City Metrorail station in Arlington, Virginia.

19. On October 21, 2010, AHMED sent an email message to an individual whom he believed to be affiliated with al-Qaeda, indicating that he had completed the surveillance of an additional Metrorail station, and would be available to meet with a courier between October 27 and October 29, 2010.

20. On October 27, 2010, AHMED passed to an individual whom he believed to be affiliated with al-Qaeda a thumb drive containing surveillance of the Crystal City Metrorail

station, and five Metrorail farecards to enable the easy entry into the Metrorail system of the individuals that AHMED believed would be al-Qaeda suicide bombers.

The acts taken by the defendant, Farooque Ahmed, in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney

After consulting with my attorneys and pursuant to the plea agreement entered into this day between the defendant Farooque Ahmed, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____ 3-29-11
Farooque Ahmed

We are Farooque Ahmed's attorneys. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____ 3-29-11
Todd Richman
Kenneth Troccoli
Attorneys for Farooque Ahmed